The UNITED STATES, Plaintiff,

v.

Sonia CARDENAS, Defendant.

No. 72–CR–1323.

United States District Court,
E. D. New York.

July 31, 1973.

Robert A. Morse, U. S. Atty., Brooklyn, N. Y., for the Government by George G. Bashian, Jr., Brooklyn, N. Y.

Martin L. Schmukler, New York City, for defendant.

ZAVATT, District Judge.

## MEMORANDUM

After a trial to a jury, the defendant was found guilty on January 11, 1973 of all three counts of the indictment which charged her (a passenger aboard Avianca Flight 54 from Colombia, South America) with having unlawfully possessed and brought into the United States, on December 6, 1972, 419 grams of 57% pure cocaine. An expert witness testified that when cut three times, this cocaine would have a street value of $163,000.00.

When the jury returned its verdicts, the defendant's attorney advised the court of the defendant's desire to be sentenced immediately, without awaiting a presentence report; stated that the defendant would "turn 21" on the first day of the following month; that the defendant was eligible for youth offender treatment under 18 U.S.C. § 5010 of the Youth Corrections Act (the Act), 18 U.S.C. §§ 5005 and 5007; urged the court to consider § 5010 in imposing sentence and requested that the defendant be sentenced immediately.

The defendant had entered the United States on a Colombian passport and temporary visitor's visa issued by American authorities in Colombia, South America. Having been so convicted, she is subject to deportation and, for that reason, I did not feel that a commitment under 18 U.S.C. § 5010 was appropriate. I did comment on the seriousness of the crimes she had committed and I did not consider the Youth Corrections Act from the standpoint of whether she would derive benefit from treatment under subdivisions (b) or (c) of § 5010.

On January 11, 1973, I sentenced the defendant to a term of five (5) years, under 18 U.S.C. § 4208(a)(2), plus a 3

year special parole term on each count, mandated by 21 U.S.C. §§ 841(b)(1)(A) and 960(b)(1)—said sentences to run concurrently. When I so sentenced the defendant I was not aware of, nor did the attorney for the defendant or the attorney for the Government call my attention to, any judicial decisions construing 18 U.S.C. § 5010(d). Nor did either attorney call my attention to any judicial decisions at any time thereafter.

On appeal from the judgment of conviction, the Court of Appeals, by its order dated May 11, 1973, "ordered, adjudged, and decreed that the action be and it hereby is remanded in part due to the concession of the appellee and that the judgment of the said District Court be and it hereby is affirmed in all other respects." In its appellate brief, the Government made the following concession: "In this case the Government must concede that certain remarks made by Judge Zavatt at the time of sentencing appear to indicate that the trial court in denying appellate youthful offender treatment considered only the nature and magnitude of the offense charged and did not consider the question of whether appellant would benefit from treatment under the Act." I consider the order of remand as requiring me to state whether I did or did not give consideration to the possibility of sentencing the defendant under the provisions of the Act and, if not, to consider that possibility and resentence the defendant.

The circuits are not in complete agreement as to whether a sentencing judge, before sentencing a person under age 22 as an adult, must make an express or implied finding or no finding that the youth offender will not benefit from treatment under 18 U.S.C. § 5010(b) or (c). At the time I sentenced the defendant, the Court of Appeals for the Second Circuit had not spoken on this question. Since that time it has indicated that the trial judge must give consideration to the possibility of sentencing a youth offender under the Act, before

sentencing that offender as an adult. United States v. Guzman, 478 F.2d 759 (2d Cir. May 7, 1973); United States v. Matusewitch, 481 F.2d 174 (2d Cir. June 22, 1973). The Court of Appeals for the District of Columbia Circuit has held that, before a youth offender may be sentenced as an adult, the trial judge must make an express finding that he will not derive benefit from treatment under 18 U.S.C. § 5010(b) or (c) before sentencing him as an adult. United States v. Coefield, 476 F.2d 1152 (D.C. Cir. 1973) (en banc); United States v. Ward, 454 F.2d 992 (D.C.Cir. 1971); United States v. Waters, 437 F.2d 722 (D.C.Cir. 1970). The Court of Appeals for the Fourth Circuit has held to the same effect. Cox v. United States, 473 F.2d 334 (4th Cir. 1973) (en banc). The Ninth Circuit has held that an implied finding that a youth offender will not derive benefit from treatment under the Act is sufficient. United States v. Jarratt, 471 F.2d 226 (9th Cir. 1972). The Court of Appeals for this Circuit has left open the question as to whether the trial judge must make a finding, expressed or implied, before sentencing a youth offender as an adult and seems to have held, thus far, that the trial judge must consider the Act before sentencing a youth offender as an adult. United States v. Guzman, *supra*; United States v. Matusewitch, *supra*.

The Act defines "treatment" to mean "corrective and preventive guidance and training designed to protect the public by correcting the antisocial tendencies of youth offenders." 18 U.S.C. § 5006(g). It defines a "youth offender" as "a person under the age of twenty-two years at the time of conviction," 18 U.S.C. § 5006(e) and a "committed youth offender" as "one committed for treatment hereunder to the custody of the Attorney General pursuant to section 5010(b) and 5010(c) of this chapter." 18 U.S.C. § 5006(f). The Act has created, within the Board of Parole, a Youth Correction Division, 18 U.S.C. § 5005, "to consider problems of treatment and correction, to consult with, and

make recommendations to the Director [of the Bureau of Prisons] with respect to the general treatment and correction policies for committed youth offenders, and to enter orders directing the release of such youth offenders conditionally under supervision and the unconditional discharge of such youth offenders, and take such further action and enter such other orders as may be necessary or proper to carry out the purposes of this chapter." 18 U.S.C. § 5007. The Director of the Bureau of Prisons, in his letter to me dated July 24, 1973, stated that "One of the distinctive factors of a YCA commitment is the community supervision to follow. However, since Miss Cardenas is to be deported to Colombia at the end of her sentence, she will not benefit from this provision."

In all of the cases on point, the courts speak of "treatment" as if it is a matter of common knowledge among federal trial judges; as if federal trial judges know what that treatment is and from which such treatment a youth offender will or will not derive benefit. The fact of the matter is that no cognizant federal bureau, division or agency, to my knowledge, has compiled material for distribution to trial judges explaining the "treatment" or varieties of treatment which are provided to youth offenders committed under the Act or describing the institutions or other agencies where such treatment is available. Without this essential information, a trial judge can hardly make an intelligent or meaningful finding as to whether or not a youthful offender, in a given case, will benefit from treatment if committed under Subsections (b) or (c) of

§ 4510. In a recent telephone conversation with Mr. Roy Gerard of the Board of Parole, who is in charge of the placement of prisoners sentenced or committed for violation of federal law, I was advised that the Bureau of Prisons is preparing, for distribution to concerned agencies and to federal judges, a manual which will explain the treatment programs in all federal institutions, community treatment centers and contract facilities. Such information, when available, should be of inestimable value and assistance to the trial judge who must consider the Youth Corrections Act before imposing sentence upon a youth offender, either under the Act or under any other applicable penalty provision. Such a manual, furthermore, might obviate the need of orders of commitment for observation, study and report, 18 U. S.C. § 5010(e) by the trial judge, who is faced with the problem in youth offender cases of either making a finding or considering § 5010 before imposing sentence.

Upon receipt of the order of remand, I communicated with the Warden of the Federal Reformatory for Women at Alderson, West Virginia (Alderson), the Youth Corrections Division of the Board of Parole and the office of the Director of the Bureau of Prisons to ascertain what treatment the defendant would receive were I to commit her under either subdivision (b) or (c) of 18 U.S.C. § 5010. I received from the Warden at Alderson the publications of that institution with reference to its organization and programs.[1] At her request, I received similar information[2] from the Robert F. Kennedy Youth Center (KYC)

1. Site Plan of Alderson, dated June 1970. Jacquelen L. Smith, Principal, "Educational—Vocation Program" (prepared for all visitors)
Virginia W. McLaughlin, Warden "Federal Reformatory for Women, Alderson, West Virginia"
Jacquelen L. Smith, Principal, "Model of Education Department," June 1, 1973
Joseph J. Greenwood, Jr., Drug Abuse Program Manager, "Model of NARA/DAP Services," June 1, 1973

Thomas J. Schiffer, Chaplain "Model of Religious Department," June 1, 1973
Dr. Norman B. Ream, Jr., Director of Mental Health, "Model of Health Department," June 1, 1973

2. "Robert F. Kennedy Youth Center," a brief statement approved by the Bureau of Prisons, February 20, 1970. "Robert F. Kennedy Youth Center" 1970 Annual Report, March 1, 1971. Helene Enid Cavior, "Population Trends—1972"

located at Morgantown, West Virginia. From these several sources, I have received all of the information I would receive were I to commit the defendant for observation, study and report pursuant to 18 U.S.C. § 5010(e).

There are two federal institutions East of the Mississippi River to which youth offenders, sentenced under the Act, may be committed by the Attorney General for "treatment"—namely: KYC and Alderson. KYC became operational at Morgantown, West Virginia on January 14, 1969, when it replaced the century-old National Training School for Boys, Washington, D. C. It is a completely open cottage-type correctional facility which receives a select group of juvenile, youth and young adult federal law violators who are deemed suitable for handling in a minimum security institution. Its program is designed, basically, to meet the needs of youthful, unsophisticated male and female offenders who have residence in states generally East of the Mississippi River; to help the younger, less sophisticated person overcome social, psychological and educational deficiencies. The objective of the training program is to produce trainable young people, but there is some limited capacity for in-depth skills training.

KYC was planned for a population of 190 males and 120 females. By early June of 1970, the KYC population reached a high of 283. The Staff-Student Relationship Report of February 1973, cited in footnote 2, reports only 45 females out of its total population, all of whom are housed in a single cottage—there being no typology for such a small percentage of females. The males, on the other hand, are classified according to behavior pattern and housed in "BC-Type" cottages as follows:

BC-1 cottage—inadequate and immature

BC-2 cottage—neurotic and disturbed

BC-3 cottage—unsocialized and psychopathic

BC-4 cottage—socialized and subcultural.

Although there is no current typology for the "female students" the above categories give a general idea of the types of offenders for whom the Attorney General designates KYC.

KYC is still in the experimental stage. It has had many problems, including the relatively high percentage of escapees from such a small institution with such a small population. The escapee statistics in 1969, 1970, 1971 and the first seven months of 1972 are as follows:

1969—37
1970—90
1971—52
1972
1/1–7/31—30

The decline in the number of escapees, commencing during the latter half of 1972, is due to various factors. The single event more than any other factor, which accounts for this decline, is the fact that, in June 1970, the local federal judge imposed additional sentences on escapees and directed that they be transferred to other federal facilities.

No commitments to KYC are accepted without the special designation by the Case Management unit of the Bureau of Prisons. In a telephone conversation with the head of that Unit, I learned that, since the defendant is subject to

Karacki, Schmidt and Cavior, "Progress Report of Evaluation of KYC Programs —August 1972"

Karacki and Cavior, "1972 Follow-up of KYC Releases," April 1972

Cavior, "Staff-Student Relationship at KYC," February 1973

Minor, "Sentence Procedures Most Used With R. F. Kennedy Youth Center Students"

Karacki and Goodykoontz, "New Parole Board Hearing Procedures," March 1973

Karacki and Levinson, "A Token Economy In a Correctional Institution for Youthful Offencers," September 1969.

deportation, the Bureau of Prisons would not designate KYC for her, were I to sentence her under either Subsection (b) or Subsection (c) of § 5010, apparently, because KYC is completely open with no security. It is to be noted that the Act authorizes the commitment of youth offenders to maximum, medium or minimum security-type institutions. 18 U.S.C. § 5011.

The defendant does not fit into any of the behavior categories of youth offenders who are committed to KYC. Nor is she in need of vocational training. At the trial, it was learned that this defendant (under 22 years of age at the time of conviction) was born and has lived continuously in Colombia, South America. Although she left school at age 12, she has supplemented her grammar school education by a nine-month course in a commercial school where, among other things, she learned typing; one year of training in a dressmaking school and a beautician school. This training qualified her for employment as a dressmaker, at which she worked for six months over a two year period, and for employment in a beauty shop, where she worked on Saturdays and Sundays over a period of nine months. She has also worked in shoe shops over two periods of six months each and has had six months of vocational experience in her uncle's drug store.

The only other federal institution for females, East of the Mississippi, is the Federal Reformatory for Women at Alderson (Alderson), West Virginia. Until KYC became operational in 1969, Alderson was the only such institution East of the Mississippi. It is the major institution in the United States for the detention of female federal offenders and received its first commitments in early 1927.

Offenders sent to Alderson range in age from 15 to 80 and upward. Its residents may be from any of the fifty states and include aliens who have violated the laws of the United States. Its population varies and, over the past twenty years, has ranged from 350 to 650. Its mission is the correction of the female offender and the release to society of persons better prepared to assume their responsibilities as productive members of society. It provides a viable program of direction and training consisting principally of employment, teaching good work habits, recreation, opporunity for religious activities, medical treatment, general education and help through group therapy—as well as development of initiative and a sense of responsibility and the encouragement of wholesome interests and activities. As I understand the programs and their implementation at Alderson (from a study of the materials itemized in footnote 1), the treatment at Alderson for inmates of all ages is the same, except as to those drug addicted persons sentenced under NARA and others who have a history of drug abuse (DAP) and voluntarily seek treatment at Alderson. The NARA/DAP Department is a major department at Alderson. The Director of the Bureau of Prisons in his letter to me, dated July 24, 1973, confirms my understanding of the material furnished to me by the Warden. "As you know from the information provided by Warden McLaughlin, the same programs are available for youth cases as they are for adults at Alderson." Furthermore, I have been advised by the Placement Unit of the Bureau of Prisons that, should I sentence the defendant under Subsection (b) or (c) of § 5010, she would be committed to Alderson, the very same institution where she is presently confined.

In view of all of the foregoing, I find that the defendant will not derive any benefit from a sentence under Subsection (b) or Subsection (c) of § 5010 and hereby resentence her to the same sentence I imposed on January 11, 1973, to wit: that the defendant is committed to the custody of the Attorney General who shall designate the place of confinement for 5 years plus a 3 year special parole term. This sentence is imposed on each

count of the indictment and all sentences including the 3 year special parole term are to run concurrently. The sentence is imposed under 18 U.S.C. § 4208(a)(2).